UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| FIFTH THIRD BANK, | ) |
| | ) |
| Plaintiff/Counterclaim-Defendant, | ) |
| | ) Case No. 3:11-0035 |
| | ) Judge Trauger |
| v. | ) |
| | ) |
| STEVE HULEN CONSTRUCTION, LLC, | ) |
| G. STEVE HULEN and JANICE HULEN, | ) |
| | ) |
| Defendants/Counterclaim-Plaintiffs. | ) |

## MEMORANDUM

Pending before the court is plaintiff/counterclaim-defendant Fifth Third Bank's ("Fifth Third's") Motion to Dismiss (Docket No. 20), to which the defendants/counterclaim-plaintiffs Steve Hulen Construction, LLC, G. Steve Hulen and Janice Hulen (collectively "the Hulens") have responded (Docket No. 29), and Fifth Third has filed a reply in support (Docket No. 31). Fifth Third has also filed a Motion to Strike (Docket No. 18), to which the Hulens has responded (Docket No. 28), and Fifth Third has filed a reply in support (Docket No. 30). For the reasons discussed herein, the Motion to Dismiss will be granted in part and denied in part, and the Motion to Strike will be denied.

## BACKGROUND

Fifth Third filed its two-count Complaint in this case on January 10, 2011. (Docket No. 1.) Fifth Third alleges that, from 2005 to 2007, it made a series of construction loans (secured by deeds of trust in real property) to defendant Steve Hulen Construction, LLC and that the loans

1

were guaranteed by individual defendants Steve and Janice Hulen. (*Id*. at 2-5.) Fifth Third further alleges that Steve Hulen Construction defaulted on the loans in May 2010, and the encumbered property was subsequently foreclosed upon. (*Id*. at 5.) Fifth Third sues to recover the alleged $283,408.66 (plus fees, costs, and expenses) shortfall remaining on the loans following the foreclosure sale. (Id.)

On April 1, 2011, the Hulens filed their six-count Counterclaim.[1] The Hulens maintain that they are long-standing, well-respected members of the Williamson County, Tennessee construction industry, and, in light of that success, in 2005, Fifth Third approached the Hulens about making loans to finance a series of construction projects. In November 2005, Hulen Construction and Fifth Third reached an agreement whereby Fifth Third would finance the "Brownstone construction project," which involved construction on six separate lots in Franklin, Tennessee. (Docket No. 13 at 13.) To obtain financing for those lots, Hulen Construction signed promissory notes in favor of Fifth Third Bank, and the notes were secured by deeds of trust on the property and personally guaranteed by Steve and Janice Hulen.

Four of the Brownstone lots sold quickly, but two, known as Lot 10 and Lot 24, did not. The promissory note on Lot 24 was made in the principal amount of $840,000 and the note on Lot 10 was for $1,400,000. The interest rate on both notes was originally set at the "prime" rate.

In June 2007, the Hulens and Fifth Third agreed on financing for two additional construction projects in Brentwood, Tennessee, known as Lot 42 Windstone and Lot 18

---

[1] Unless otherwise noted, the facts stated herein are drawn from the Counterclaim. (Docket No. 13.)

Windstone. Again, Hulen Construction signed promissory notes (roughly $350,000 for each lot) in favor of Fifth Third to finance construction, and the notes were secured by deeds of trust on the property and personally guaranteed by the Hulens. The original interest rate on these notes was .35 percent below prime. Prior to entering into this additional loan relationship, Mr. Hulan had signed "additional guaranties . . . provid[ing] that Mr. Hulen would be generally liable for all of Hulen Construction Co.'s indebtedness to the bank, regardless of obligation." (*Id*. at 15).

At the end of 2007, the relationship between the Hulens and Fifth Third was still very positive, and the Hulens worked with loan officer Daryl McCubin to extend the Lot 24 loan and reduce its interest rate to .35 percent below prime. In June 2008, McCubin was replaced by John Sharp, who renewed the Lot 42 and Lot 18 notes at .35 percent below prime. The parties also had lengthy discussions about converting a few of the loans to "in house" loans to achieve even more favorable terms.

The Hulens maintain that the tenor of their relationship with Fifth Third changed dramatically with the onset of the September 2008 financial crisis and subsequent "Great Recession." Loan extension offers were now presented with significantly increased interest rates, in a "take it or leave it" fashion, and discussions regarding conversion of the loans to "in house" loans were abandoned.

In April 2009, two months after the Lot 24 loan matured, Fifth Bank demanded that – to further extend the Note – significant increases in principal payments and interest rates would be required, and the Hulens would be required to "cross-collateralize all of their obligations to the bank." (*Id.* at 17.) Again, the Hulens maintain, this proposal, which they accepted without the assistance of counsel and in reliance on their long-standing relationship with the banking

3

industry and Fifth Third, was presented "take it or leave it," and they were afforded little time to consider the offer. The Hulens accepted a similar offer, presented in similar fashion with similar terms, to extend the term of the loan on Lots 42 and 18 in June 2009.

By September 2009, the Hulens claim, the payment requirements generated by the loan modifications "were no longer bearable" and default appeared imminent. (*Id*. at 19.) The Hulens' account was transferred to Fifth Third's "Special Assets Group" and relationship manager Tom Carroll. The Hulens maintain that Carroll was "manipulative, insensitive, rude and unprofessional" and that he "took delight in their financial difficulties." (*Id*. at 9, 19.) Among other things, the Hulens claim that Carroll mimed shooting Mr. and Mrs. Hulen during a meeting, indicating that he would "kill them financially" and interrupted a meeting to gawk at a woman in a short skirt in the parking lot of the building. (*Id*. at 20).

In December 2009, the Hulens and Fifth Third (through Carroll) entered into eventually fruitful discussions regarding a Forbearance Agreement. In exchange for a payment of $22,400 and an increased interest rate on the outstanding debt, the parties agreed that Fifth Third would not foreclose on the subject property until May 1, 2010, giving the Hulens several additional months to satisfy their obligations on the loans.

Given that the prime real-estate selling season would not begin until late Spring, the Hulens allege that they were not confident in their abilities to meet their obligations by May 1st, and, "to obtain th[e Forbearance Agreement], Carroll told the Hulens that he would work with them to provide a subsequent forbearance if they were not able to sell the properties before May 1st." (*Id*. at 10, 20.) Specifically, in response to the Hulens' question about "whether Fifth Third Bank would work with them to provide a subsequent forbearance," Carroll stated, "I'm

4

sure we will work something out." (*Id*. at 21.) Without this assurance, the Hulens maintain, they would not have entered into the Forbearance Agreement. The Hulens agreed in principle to the Forbearance Agreement and paid the associated fees in December 2009.

On January 6, 2010, the Hulens received a copy of the draft Forbearance Agreement, sent by counsel for Fifth Third. The Forbearance Agreement did not mention the Hulens' $22,400 payment and "also expressly included Lot 10 Brownstone as one of the obligations to be delayed until May 1, 2010." (*Id.* at 22.) The Hulens had a contract in place to sell Lot 10, with closing set for January 20, 2010. In response to learning this from the Hulens, Carroll eliminated Lot 10 from the Forbearance Agreement and stated, over the Hulens' objections, that he would use the proceeds of that sale to bring the Hulens current on certain obligations.[2]

After the sale on Lot 10 closed, the parties formally signed the Forbearance Agreement, which only covered Lots 42, 24, and 18. When these lots had not sold by late April 2010, the Hulens approached Carroll about a second forbearance to prevent foreclosure on those lots. The Hulens maintain that Carroll had no intention to keep the promise to "work with" the Hulens on subsequent forbearance terms, because "when late April came around and the Hulens inquired about another forbearance, Carroll outright refused to provide one, absent the Hulens' agreement to a new and unreasonable commitment to the bank, roughly equal to $550,000." (*Id*. at 10.) When the Hulens refused to make this new commitment, Fifth Third foreclosed.

In early 2011, Mr. Hulen "bumped into Daryl McCubin," the Hulens' former loan officer, at the grocery store. (*Id*. at 24.) In talking with McCubin, who had left Fifth Third in 2008, Mr.

---

[2]The court includes all of the primary factual allegations from the Counterclaim for the purposes of completeness. As can be seen from the discussion below, not all of these allegations bear on the viability of the Hulens' claims.

Hulen learned that McCubin had stayed in touch with Sharp and Carroll, and that, from Carroll, McCubin "knew all about the Hulens' situation with the bank," including a "striking amount of detail concerning the Hulens' dealings with Mr. Carroll and Fifth Third Bank in general . . . [and] other private and confidential information about their finances." (*Id*. at 24.) The Hulens maintain that they did not authorize anyone at Fifth Third to publicly disclose this information and that this disclosure, which they maintain was done "with the intent to damage the Hulens' professional reputation and prospective business relationships in the Williamson County banking community," has damaged them. (*Id.* at 25.)

## ANALYSIS

The Hulens assert six claims in their Counterclaim. Three claims – fraud in the inducement, breach of the implied duty of good faith and fair dealing, and violations of the Tennessee Consumer Protection Act – relate to Carroll's promises regarding a second forbearance and the other three claims – violations of the Tennessee Financial Records Privacy Act, invasion of privacy, and tortious interference with business relationships – relate to Fifth Third's allegedly improper disclosure of information to McCubin. (*Id*. at 25-30.) Fifth Third has moved to dismiss all of these claims under Fed. R. Civ. P. 12(b)(6).

**I.      Standard of Review**

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint [or counter-complaint] in the light most favorable to the plaintiff [or counter-plaintiff], accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require that such a

plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The court must determine whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949-50 (2009).

## II. Fifth Third's Motion to Dismiss

### A. Fraud in the Inducement

Again the promise that forms the basis of the Hulens' fraud claim is Carroll's statement that "I'm sure we will work something out," regarding a second forbearance. As this alleged misrepresentation is "forward looking," the claim here under Tennessee law is one for promissory fraud. *See Styles v. Blackwood,* 2008 WL 5396804, *7 (Tenn. Ct. App. Dec. 29, 2008). To establish a claim for promissory fraud, the party asserting the claim must show that a material promise of future conduct was made with the intent not to perform, that reliance on the promise was reasonable, and that the party asserting promissory fraud was injured thereby. *Id.*

7

Fifth Third's primary argument is that, in light of the terms of the Forbearance Agreement, which it adds to the record here, the Hulens cannot state a claim that they reasonably relied on the alleged promise.[3] The Forbearance Agreement recites, among other things, that the Hulens are in default and are not "relying on statements, inducements, actions, or omissions of [Fifth Third] except" as stated in the Agreement, which makes no mention of a second Forbearance Agreement. (Docket No. 22 at 5.) Rather, the Forbearance Agreement states that "all outstanding principal plus all then accrued interest plus all other amounts due under the Notes" is due at the end of the forbearance period, and Fifth Third is "under no obligation to forbear in any respect and shall be entitled immediately to exercise all of its rights and remedies under the Loan Documents, all without further notice" to the Hulens. (*Id*. at 6-7.) Finally, the Forbearance Agreement contains a "merger clause," which recites that it is the "entire agreement" of the parties and "supersedes any other discussions or agreements relating to the subject matter of this Agreement." (*Id*. at 9.)

In arguing that any reliance on the alleged "work with" promise is unreasonable as a matter of law in light of the terms of the Forbearance Agreement, Fifth Third points to this court's opinion in *Guesthouse International Franchise Sys. v. British Am. Properties McArthur Inn*, 2009 WL 278214 (M.D. Tenn. Feb. 5, 2009)(Trauger, J) in which the court dismissed a

---

[3]Fifth Third also, in conclusory fashion, maintains that the Hulens have not alleged a "promise." (Docket No. 21 at 10.) This argument fails on the basic text of the Counterclaim, which clearly alleges that Carroll "unequivocally" said that he would work with the Hulens on a second forbearance agreement. (Docket No. 13 at 21.) Whether or not the promise was kept, the allegation represents that a promise was made, under any reasonable definition of the term. Fifth Third is correct that its filing of the Forbearance Agreement, which is repeatedly referred to in the Counterclaim, does not convert the Motion to Dismiss into a Motion for Summary Judgment. *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997).

promissory fraud claim at the summary judgment stage, recognizing that, while a "merger clause" does not "per se" eliminate fraudulent inducement claims based on prior representations, "the Tennessee Court of Appeals held that 'proof of fraud in the inducement or promissory fraud is limited to subject matter which does not contradict or vary the terms that are plainly expressed in the written contract.' *Burton v. Hardwood Pallets, Inc.*, 2004 WL 572350, *2 (Tenn. Ct. App. March 22, 2004). That is, it is unreasonable to rely on prior oral representations that contradict the language presently before the individual signing the contract. *Id.*" 2009 WL 278214, *7.

Fifth Third argues that, under *Guesthouse* and the Tennessee law on which it was based, the "alleged promises of future forbearance are barred not only by the merger clause in the Forbearance Agreement, which negates any such additional promises, but also by a specific contractual term [noted above] negating any obligation to forbear beyond the forbearance period set out in the agreement." (Docket No. 21 at 13.)

In response, the Hulens argue that the alleged "work with" promise "does not contradict" the terms of the Forbearance Agreement but "explains or supplements" its terms, and, therefore, is viable proof to support a promissory fraud claim. (Docket No. 29 at 7 quoting *Hunt v. Tisdale*, 2007 WL 2827051, *5 (Tenn. Ct. App. Sept. 28, 2007)). That is, the Forbearance Agreement's statement that Fifth Third is under "no obligation" to grant further forbearance is not contradicted by Carroll's statement that he would "work with" the Hulens to find a reasonable solution that did not require foreclosure. (*Id*. at 8.) The Hulens note that *Guesthouse* was decided based upon a complete summary judgment record and clear evidence that the party asserting fraud in that case was sophisticated and had read and understood the merger clause. (*Id*. at 9.) In contrast, the Hulens allege that they were unrepresented and did not understand the

9

meaning of the merger clause. (*Id*. at 9-10.)

This is a close call, but the court will allow the claim to move forward.[4] If the Hulens alleged that Carroll had stated that "Fifth Third is obligated to grant you a second forbearance," then, in light of the language of the Forbearance Agreement, reliance would likely be unreasonable as a matter of law. However, that is not the promise alleged; the Hulens allege that, in addition to all the language about "no obligation" and Fifth Third's potential rights and remedies under the Agreement, Carroll promised that, in essence, at the end of the forbearance period, some reasonable and mutually amenable solution would be worked out – that is, failure to meet the terms of the forbearance agreement would not result in Fifth Third taking advantage of its right to end the relationship through foreclosure. It is very possible that, as in *Guesthouse*, once discovery is completed, this very narrow distinction will disappear and it will be sufficiently clear that any reliance on Carroll's alleged promise was unreasonable and dismissal of this claim will be appropriate. However, at this stage, assuming the truth of all allegations and taking them in the light most favorable to the plaintiff, the promissory fraud claim is not

---

[4]The court recognizes Fifth Third's position, which is further advanced in its Reply, that the clause in the Forbearance Agreement stating that the Hulens are not "relying" on any statements other than those expressly stated in the Forbearance Agreement and that the Forbearance Agreement is the "complete" agreement between the parties weakens the Hulens's reliance argument considerably. (Docket No. 31 at 5-8.) However, if the court granted Fifth Third's Motion to Dismiss the fraud claim on this argument, it would essentially be applying a "per se" rule that the presence of a merger clause and other similar standard language negates a promissory fraud claim, which, the Sixth Circuit has instructed, the court may not do. *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 568 (6th Cir. 2003); *see Guesthouse*, 2009 WL 278214, *7 (finding that nothing in the summary judgment record indicated that the "logic" of the general rule stated in *Burton* should be inapplicable).

"implausible" and will not be dismissed.[5]

   B.   **Breach of the Implied Duty of Good Faith and Fair Dealing**

As Fifth Third recognizes, "parties to a contract owe each other a duty of good faith and fair dealing as it pertains to the performance of a contract." *Barnes Robinson Co. v. Onesource Facility Servs. Inc.*, 195 S.W.3d 637, 642 (Tenn. Ct. App. 2006). Determining whether this duty has been breached depends on the circumstances of each case and on an analysis of the contract, the intent of the parties, and their performance. *Id.*. However, as Fifth Third also points out, the implied duty of good faith and fair dealing does not generally impose an obligation upon the parties to *negotiate* the contract in good faith – unless that obligation is stated as one of the requirements of performance of the contract. *Id.*; *see also Hermosa Holdings Inc. v. Mid Tenn. Bone & Joint Clinic*, 2009 WL 711125, *9 (Tenn. Ct. App. March 16, 2009).

It is on this ground that Fifth Third argues for the dismissal of the claim. That is, the Hulens' Counterclaim alleges that Fifth Third, through Carroll, did not negotiate the Forbearance Agreement in good faith, which is insufficient to state a claim under this theory. (Docket No. 21 at 16.) Moreover, Fifth Third argues, any claim that the "work with" representation amounted to a "contract to make a contract," is clearly unavailing. (Docket No. 31 at 10 citing *Barnes*, 195 S.W.3d at 644, which holds that a "contract to make a contract" is "no contract at all").[6]

---

[5]Both parties tie the viability of the Tennessee Consumer Protection Act claim to the court's ruling on the promissory fraud claim. (Docket No. 29 at 12-13; Docket No 31 at 2.) Therefore, this claim will not be dismissed. The court is not holding, however, that a subsequent dismissal of the promissory fraud claim necessarily means that the TCPA claim must be dismissed.

[6]Fifth Third also argues, less convincingly, that the Counterclaim fails to allege any facts that demonstrate a lack of good faith. (Docket No. 21 at 16.) Also, as the court will dismiss this claim on other grounds, it is not necessary to reach Fifth Third's argument that this claim is

In response, the Hulens make a confused argument that, "where a contract vests one party with discretion, the duty of good faith means that such discretion is not boundless and must be exercised reasonably." (Docket No. 29 at 10 quoting *Shuttleworth, Williams, Harper, Waring, & Derrick PLLC v. Smith*, 2010 WL 744375, *6 (Tenn. Ct. App. Mar. 5, 2010)). Clearly, *Shuttleworth* and similar cases hold that contract *performance* must be reasonable, but that does not help the Hulens here. The Hulens cannot escape the sound arguments made by First Third that either the "work with" representation was a statement made in negotiations or somehow amounts to a "contract to make a contract." Either way, the law provided by First Third demonstrates that the "implied duty of good faith and fair dealing" applicable to contract performance is not applicable here. Therefore, this claim will be dismissed.

  C.  **Tennessee Financial Records Privacy Act (TFRPA)**

The Hulens have alleged that the disclosure of financial information by Carroll and potentially others at Fifth Third to Daryl McCubin violates the Tennessee Financial Records Privacy Act. (Docket No. 13 at 28.) Except in certain cases not relevant here, the TFRPA makes it illegal for a financial institution to disclose "any financial records relating to" a customer of the financial institution to anyone, without the customer's consent. T.C.A. § 45-10-104. Financial records include original versions of documents, copies of documents, or "any information contained in the document," aside from basic identifying information. T.C.A. § 45-10-102(4).

In moving to dismiss this claim, Fifth Third argues that the Counterclaim is insufficient because it "does not allege what confidential financial information was disclosed for the court to

---

barred by the statute of frauds. (*Id.* at 17-19.)

determine whether the information constituted 'financial records' protected by the act." (Docket No. 21 at 20.) Fifth Third also argues that the Counterclaim does not show that McCubin "received confidential information about [the Hulens'] finances outside the scope of his employment with Fifth Third." (*Id*.)

As the Hulens point out, Fifth Third ignores a number of allegations in the Counterclaim in order to make its argument. That is, the Counterclaim explicitly alleges that McCubin had stayed in touch with Carroll following McCubin's departure from Fifth Third in 2008 and that, as of early 2011, he knew "private and confidential information" in a "striking amount of detail" and "all about the Hulens' situation with the bank," which, reading the allegations in the light most favorable to the Hulens, would include the Forbearance Agreement, the foreclosure, and other assorted difficulties. (Docket No. 13 at 24-25.) The allegations certainly state a "plausible" claim that protected information – private "information contained in [financial] documents" – was improperly disclosed by a Fifth Third representative without the Hulens' consent, and, therefore, this claim will not be dismissed.[7]

### D. Invasion of Privacy

The Hulens' invasion of privacy claim also relates to the alleged disclosure of financial information by Fifth Third to McCubin and asserts that Fifth Third has engaged in "public

---

[7]The parties dispute whether there is a private right of action under the TFRPA. Fifth Third briefly argues that there is not because one criminal case found that the Act itself "contains" no penalties. (Docket No. 21 at 21 citing *State v. Lowe*, 1990 WL 176722, *9 (Tenn. Crim. App. Nov. 15, 1990)). In response, the Hulens point out that at least one civil case has assumed – in dismissing an TFRPA claim on timeliness grounds – that such a private right of action exists. (Docket No. 29 at 15 citing *Brooks v. Collinwood Church of God*, 1989 WL 73232, *6 (Tenn. Ct. App. July 6, 1989). Fifth Third has certainly not shown that there is no private right of action here, and, therefore, at this stage, this argument is unavailing.

disclosure of private facts," which is a subset of the common law invasion of privacy tort. (Docket No. 13 at 29; *see also Scarborough v. Brown Group, Inc.*, 935 F. Supp. 954, 963 (W.D. Tenn. 1995)). Stating a claim for "public disclosure of private facts" requires allegations that the matter publicized is "highly offensive" and "not of legitimate concern to the public." *Beard v. Akzona*, 517 F. Supp. 128, 132 (E.D. Tenn. 1981). Additionally, the disclosure must be made to the public, not to a single individual or to a "small group of people." *Id.*

This claim fails for at least two reasons. First, there is no suggestion from the Counterclaim that the information disclosed to McCubin was "highly offensive," rather only that the information was personal and perhaps embarrassing. Second, the Hulens allege that the disclosure was made to McCubin, not to a significant group of people. Therefore, this claim will be dismissed.[8]

### E. Tortious Interference with Business Relationships

Once again, this claim is premised on the alleged disclosure of financial information by Fifth Third to McCubin. (Docket No. 13 at 30.) The Hulens allege that they had a long-standing relationship with the "banking community in Williamson County," with which Fifth Third intentionally interfered by disclosing their difficult financial circumstances to McCubin, a

---

[8]The Hulens argue that there is an exception to the "small group of people" rule where the disclosure occurred in the context of a violation of a "breach of contract, trust, or other confidential relationship," and, here, Fifth Third, under Tennessee law, "owed the Hulens a duty of trust and confidentiality." (Docket No. 29 at 17 citing *Beard*, 517 F. Supp. at 132.) *Beard* states that "communication to a single individual or to a small group of people, absent breach of contract, trust, or other confidential relationship, will not give rise to liability." 517 F. Supp.at 132. The court reads this language as stating that general liability (that is, other causes of action) could arise from a breach of trust or contract, but not a "public disclosure of private facts" claim, which necessarily depends on public disclosure. *See id.*

financial professional within that "small and close knit" community. (*Id.*) The Hulens allege that Carroll's disclosure to McCubin was done with the specific intent to "sever" the relationship between the Hulens and the banking community, and that the disclosure did harm their reputation and cause considerable damage. (Id.)

It is well-settled that a plaintiff must show five elements to sustain a claim for intentional interference with business relationships: (1) an existing business relationship with a specific third person or a prospective relationship with an identifiable class of third persons; (2) the defendants' knowledge of that relationship; (3) the defendants' intent to cause breach or termination of the business relationship; (4) the defendants had an improper motive or used improper means; and (5) the plaintiff suffered damages from the tortious interference. *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W. 3d 691, 701 (Tenn. 2002).

In moving to dismiss this claim, Fifth Third argues that these "are precisely the type of implausible, conclusory allegations that [*Twombly* and *Iqbal* have] held to be insufficient to state a claim." (Docket No. 21 at 24.) That is, among other things, there is "no plausible explanation as to why Fifth Third would be motivated to cause other banks to stop lending [the Hulens] money" or any plausible explanation for how they have actually been damaged. (*Id.* at 24-25.) In response, the Hulens argue that they have alleged sufficient facts, that is, that they had a long-standing relationship with the "Williamson County banking community," Fifth Third knew of that relationship, and Carroll, someone who personally disliked the Hulens and treated them with disrespect, set out to poison that relationship by telling McCubin, an individual tied into that community, all about the Hulens' financial distress. (Docket No. 29 at 18.)

Again, this is a close call, but the court will allow this claim to proceed. The Hulens

have identified an "identifiable class of third persons" (the Williamson County banking community) and have alleged sufficient facts to state a plausible (if not immediately and eminently believable) claim that Carroll, who did not like the Hulens and was an immature person, set out to poison the Hulens' relationship with that community by leaking details of the Hulens' financial situation to McCubin, thereby damaging the Hulens' reputation and causing them emotional distress and other damage.[9] Ultimately, the Hulens have done more than simply recite the elements of this cause of action and have provided some facts that support each element of the claim. Therefore, the claim will not be dismissed.

## CONCLUSION

For the reasons discussed herein, First Third's Motion to Dismiss will be granted in part and denied in part. That is, the breach of implied duty of good faith and fair dealing and invasion of privacy claims will be dismissed; all other claims may proceed. Also, Fifth Third's Motion to Strike will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

[9] Fifth Third moved to strike the Counterclaim allegation that Carroll stopped a meeting with the Hulens to gawk at a woman in the parking lot outside. (Docket No. 19.) Fifth Third argued that this allegation was "wholly immaterial" to this case and should be stricken under Fed. R. Civ. P. 12(f). (*Id.* at 2.) Such motions are rarely granted, as the allegation to be struck must have "no possible relation to the controversy." *Parlak v. ICE*, 2006 WL 3634385, *1 (6th Cir. Apr. 27, 2006). This allegation clearly advances the Hulens' argument that Carroll was unprofessional and did not respect the Hulens, which is central, at least, to the tortious interference with business relationships claim. Therefore, the Motion to Strike will be denied.